# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | No. 18-cr-00336-1 |
| v. ) | |
| ) | Judge Andrea R. Wood |
| TEKOA TINCH ) | |

## MEMORANDUM OPINION AND ORDER

Defendant Tekoa Tinch was indicted by a grand jury on charges of knowingly possessing two firearms after having previously been convicted of a crime punishable by a term of imprisonment exceeding one year, in violation of 18 U.S.C. § 922(g) (Count One); attempting to possess with intent to distribute a controlled substance, in violation of 21 U.S.C. § 846 (Count Three); and knowingly possessing firearms in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A) (Count Four).[1] A jury ultimately returned not guilty verdicts on the two firearms offenses but convicted Tinch of the drug offense, finding in a special verdict that the offense involved an attempt to possess with the intent to distribute 500 grams or more of cocaine. In his consolidated post-trial motions, Tinch now asks the Court to set aside partially the jury's verdict with respect to Count Three or, in the alternative, grant him a new trial. (Dkt. No. 203.) For the reasons stated below, the Court denies both requests.

## BACKGROUND

Tinch was found guilty by a jury of attempting to possess with the intent to distribute 500 grams or more of cocaine. During the four-day trial, the jury heard testimony from a confidential source, Ivan Walton, as well as multiple law enforcement officers involved in the investigation—

---

[1] In the revised version of the indictment provided to the jury during their deliberations, the controlled substance offense was identified as Count Two, rather than Count Three as the offense was charged in the Third Superseding Indictment.

Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") Special Agent Paul Daou; Chicago Police Department ("CPD") Officers Daniel Gutierrez, Angel Amador, Darren Ohle, and Rory Oliver; CPD Sergeant Scott Slechter; and Drug Enforcement Agency ("DEA") Group Supervisor Special Agent German Samaniego, who was offered expert testimony regarding narcotics trafficking. Additionally, the jurors were presented with over a hundred exhibits, including text messages, photographs, audio recordings of phone calls, and video recordings. The following summarizes the trial evidence.[2]

Walton, an associate of Tinch who served as a confidential source for law enforcement, testified at trial about his interactions with Tinch and Tinch's efforts to obtain a supply of cocaine. After being arrested in March 2018 on drug charges of his own, Walton agreed to cooperate with law enforcement against Tinch. Walton testified that, in the fall of 2017, Tinch told him during an in-person meeting that he was already getting cocaine for $25,000 a "key" (meaning, kilogram) and would not be interested in another supplier unless he could receive a lower price. Walton further testified that later, in December 2017, he reached out to Tinch to see if he would be willing to do a "job" for a Mexican cartel.[3] According to Walton, he believed Tinch would be interested in the job because he knew Tinch was a member of a group that specialized in that sort of work. Walton and Tinch were to receive both monetary payment and drugs in exchange for their services. Walton also testified that Tinch wanted to establish that the cartel members with whom they were dealing were in fact legitimate drug dealers, and so he

---

[2] In his post-trial motions, Tinch does not challenge his conviction for attempted possession with intent to distribute a controlled substance in its entirety but rather only the finding that the attempt involved 500 grams or more of cocaine. Accordingly, the Court focuses here on the evidence relevant to that issue.

[3] The "job" that Walton and Tinch actually discussed involved a kidnapping plot. Pursuant to the Court's motion *in limine* rulings, however, the planned kidnapping was sanitized for the jury and described at trial only as a "job."

2

negotiated some form of payment up front to serve as an assurance. Specifically, Tinch wanted to obtain a kilogram of cocaine. At the time those conversations occurred, Walton had not yet agreed to work with law enforcement, and therefore the discussions were not recorded.

However, the jury did hear recordings of subsequent phone calls between Tinch and Walton. For instance, the jury heard a clip from a recording in which Tinch tells Walton that he needs "something" from the cartel to perform the job. Walton confirmed on the stand that he understood the "something" to be cocaine. In the same clip, Tinch states that he would even buy something from the cartel at a "very very very reasonable price" to help build a relationship with them. Tinch further states that he would know "that they're dealing with the real good people" if they were "able to provide that at a supernatural price." Walton testified that he understood Tinch in the recorded conversation to be referring to his desire to confirm that the cartel was able to provide access to cocaine at a cheap price. Similarly, Walton testified that other recorded conversations referencing Tinch's desire to purchase something in the Midwest and the cartel's desire to send something to Tinch after a meetup related to cocaine. According to Walton, Tinch ultimately agreed to a price of $2,000 for the kilogram of cocaine as part of his upfront payment for the cartel job.

The jury was also presented with text messages and audio recordings of conversations between Tinch and undercover officers posing as liaisons to the cartel. For example, the jury heard an audio recording of a call between Tinch, Walton, and Officer Amador, who was posing as a Mexican cartel representative, in which Tinch asks when he will receive what he is supposed to receive and states that he needs to be sure the cartel has access to everything about which they had been talking. Again, Walton explained on the witness stand at trial that this conversation related to Tinch's request to receive cocaine as an upfront payment for the supposed job with the

3

cartel. The jury also heard audio recordings of a meetup between Tinch and Officer Gutierrez, who was undercover posing as a cartel representative, during which they discuss the deal and Tinch states that he wants a "single car part." Explaining the use of the term "car part" at trial, Officers Amador and Gutierrez, as well as Walton, explained that individuals involved in illegal narcotics transactions generally do not discuss the type of narcotic being sold in explicit terms. A car part, as Walton testified, is a common coded reference to a kilogram of drugs. Additionally, the undercover officers testified that it was their understanding that they were arranging a deal with Tinch to buy kilograms of cocaine.

Additionally, the jury heard evidence tending to show that Tinch was suspicious about possible police involvement in the transaction and took measures to minimize his own exposure. At trial, Walton testified about why his conversations with Tinch never explicitly mentioned the term "cocaine," explaining that it would look suspicious to speak so openly on the phone. The jury also heard a clip of a recorded conversation between Walton and Tinch that took place shortly after Tinch's first phone call with one of the undercover officers posing as a cartel member and during which Tinch indicates his suspicion that the contact is actually a cop. Further, Officer Gutierrez testified that Tinch acted "evasive" at an in-person meetup with Officer Gutierrez (posing as a cocaine distributor) on May 10, 2018 and refused to answer definitively questions about the possible cocaine deal. In fact, Tinch declined to specify whether he wanted brown or white car parts (code for heroin or cocaine), and soon asked whether Officer Gutierrez was a cop. Based on this line of questioning by Tinch, as well as the way Tinch was looking at him, Officer Gutierrez thought Tinch was nervous. And the jury was shown a text message conversation in which Tinch tells Officer Gutierrez, still acting in an undercover capacity, that Tinch could tell from his language that he was a federal officer. Tinch quickly follows up the

4

accusation with a message stating that Officer Gutierrez should "stop trying to get [Tinch] to say [Tinch] want[s] to buy cocaine from [the him]," after which Tinch states that Officer Gutierrez will not "get [him] on that one."

Finally, the jury was shown multiple video recordings in which Tinch meets up with Officer Amador, still posing as a cartel member, and receives a sham kilogram of cocaine. In the videos, Tinch arrives at the designated meeting spot (a grocery store parking lot), approaches Officer Amador, and retrieves a brick of sham cocaine from the side door of a pickup truck. After Tinch receives the sham kilogram of cocaine, he removes it from the bag in which it was being stored and inspects it for several seconds. When asked by Officer Amador whether it was "se bueno [is it good]," Tinch responds that "si [yes]," it is good. The jury saw this sequence of events from different angles—including surveillance footage of the parking lot in which the exchange took place, footage from a camera on Officer Amador, footage from a camera installed in the cab of the truck in which the sham kilogram had been placed, and footage taken by other law enforcement officers recording the scene from a nearby car. Photographs of the kilogram of sham cocaine delivered to Tinch were also shown at trial, where an officer testified as to the characteristics that made the kilogram resemble cocaine as compared to another type of drug. Finally, during his testimony, Officer Amador held up the sham kilogram used during the operation for the jury to see and explained how it was shaped like a real brick of cocaine.

## DISCUSSION

Tinch has filed post-trial motions under Federal Rules of Criminal Procedure 29 and 33. Rule 29 requires the Court to enter a judgment of acquittal when the evidence presented at trial "is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). When evaluating whether the evidence supports a guilty verdict, a court must "view the evidence in the light most favorable to

5

the prosecution and ask whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Salinas*, 763 F.3d 869, 877 (7th Cir. 2014) (citing *Jackson v. Virginia*, 443 U.S. 317, 319 (1979)). To grant a Rule 29 motion, the court must conclude that "the record is devoid of the evidence from which a reasonable jury could find guilt beyond a reasonable doubt." *United States v. Mire*, 725 F.3d 665, 678 (7th Cir. 2013) (internal quotation marks omitted). Thus, courts have repeatedly emphasized that "any challenge to the sufficiency of the evidence comes with a heavy, indeed, nearly insurmountable burden, and [the court] reverse[s] only if no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Moreno*, 922 F.3d 787, 793 (7th Cir. 2019).

In the alternative, Tinch seeks a new trial pursuant to Rule 33, which allows a court to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. Thus, "[a] defendant is entitled to a new trial if there is a reasonable possibility that a trial error had a prejudicial effect upon the jury's verdict." *United States v. Van Eyl,* 468 F.3d 428, 436 (7th Cir. 2006). Nonetheless, the Seventh Circuit has cautioned that such motions should be granted only in "the most extreme cases." *United States v. Linwood*, 142 F.3d 418, 422 (7th Cir. 1998) (internal quotation marks omitted); *see also United States v. Santos*, 20 F.3d 280, 285 (7th Cir. 1994) (explaining that jury verdicts in criminal cases are "not to be overturned lightly").

### I. Request for Partial Judgment of Acquittal as to the Amount and Type of Controlled Substance

Tinch first contends that he is entitled to a partial judgment of acquittal because the evidence was not sufficient for the jury to convict him of attempting to possess 500 grams or more of cocaine. Specifically, he asserts that the evidence was at best ambiguous as to whether he sought to obtain cocaine or heroin, and that no evidence supported a finding that he wanted over

500 grams. But, contrary to Tinch's assertions, there was sufficient evidence for a jury to find him guilty beyond a reasonable doubt as to both the quantity and type of drug.

Most significantly, Walton testified at trial that Tinch told him that he was interested in obtaining a source for reasonably priced cocaine. Walton also confirmed that, during the recorded phone calls between Tinch and himself, he understood Tinch's statements about wanting to buy something from the cartel at a very reasonable price to be a reference to cocaine. Moreover, Walton explained why the term "cocaine" was never used in any of the recorded conversations in which he participated, noting that people involved in such illegal transactions take care not to mention the actual type of drug. Tinch challenges both Walton's credibility and understanding of their conversations. But it is the quintessential role of the jury to assess a witness's credibility and decide how much weight to give their testimony. *See United States v. Peterson*, 823 F.3d 1113, 1121–22 (7th Cir. 2016) (noting that arguments about whether a witness's testimony could support a finding of guilt improperly "invites [the court] to second-guess the jury's credibility determinations" (internal quotation marks omitted)); *see also United States v. Green*, 648 F.3d 569, 578 (7th Cir. 2011) (stating that a court will "overturn a conviction based on a credibility determination only if the witnesses' testimony was incredible as a matter of law"). The jury was thus entitled to find Walton's statements credible and rely upon them to determine that Tinch sought to purchase a kilogram of cocaine as opposed to another drug.

Furthermore, while the jury could have relied on Walton's testimony alone to find that Tinch was interested in more than 500 grams of cocaine, his testimony was corroborated by other evidence introduced at trial. For instance, the jury heard recordings in which Tinch told an undercover officer that he wanted a "single car part," which an expert testified was a coded reference to a kilogram of drugs. Undercover officers involved in the investigation also testified

7

that they understood Tinch to be seeking a kilogram of cocaine. And Tinch himself explicitly references cocaine in text messages that were shown to the jury. Additionally, the jury was shown video recordings of Tinch arriving at a meeting with an undercover officer to exchange the cocaine. In those videos, Tinch retrieves the sham kilogram of cocaine, removes it from the bag in which it was located, inspects it for several seconds, including by seemingly breaking off a piece, and then walks off with it. When asked by the undercover officer if the sham kilogram was "se Bueno [is it good]" following his inspection, Tinch confirms that "si [yes]," it was. In sum, there is more than enough evidence from which a reasonable jury could find Tinch guilty of attempting to possess 500 grams or more of cocaine beyond a reasonable doubt.

 In arguing to the contrary, Tinch relies heavily on the fact that he never specifically told the undercover officers with whom he was dealing that he wanted to purchase a kilogram of cocaine, not even through code. According to Tinch, the lack of any explicit instruction meant that there was no meeting of the minds between himself and the undercover officers as to what exactly he sought to purchase. The relevance of any such "meeting of the minds," however, is unclear. Tinch was charged with attempted possession with intent to distribute, a crime for which the Government was not required to prove that there was any meeting of the mind between Tinch and a third party. Instead, the focus at trial was on Tinch's intent alone—whether he intended to possess cocaine and intended to distribute it to another. Furthermore, Tinch's claim that there was no meeting of the minds is belied by the fact that every other party involved in the transaction testified at trial that, at all relevant times, they understood the transactions they were discussing to to involve the exchange of significant quantities of cocaine.

 Tinch also relies on the fact that he never used the word "cocaine" in communications with undercover officers to suggest that the jury could not have found him guilty of attempting to

8

possess cocaine in particular. Several witnesses, however, testified that people involved in narcotics deals would never use the official name of the drug. Additionally, the jury could reasonably to rely on testimony and evidence indicating that Tinch was suspicious of the undercover officers and feared they were law enforcement to infer that Tinch's failure to refer to cocaine explicitly reflected his desire to be cautious rather than a lack of intent to purchase that specific drug. Thus, even without a direct statement from Tinch as to his intentions, a reasonable jury could still find that he sought to obtain a kilogram of cocaine. *See United States v. Moore*, 572 F.3d 334, 337 (7th Cir. 2009) ("A verdict may be rational even if it relies solely on circumstantial evidence.").

Tinch further maintains that the weight of the evidence cannot support his conviction because, standing alone, each piece of evidence is ambiguous as to the type and quantity of the drugs he sought. But a court, in conducting an inquiry under Rule 29, "must not rend the fabric of evidence and examine each shred in isolation; rather, the reviewing court must use its experience with people and events in weighing the chances that the evidence correctly points to guilt against the possibility of innocent or ambiguous inference." *United States v. Wilson*, 879 F.3d 795, 802 (7th Cir. 2018) (internal quotation marks omitted). Thus, although Tinch contends that his use of the term "car parts" cannot support a finding that he wanted to purchase cocaine because that term can sometimes refer to drugs other than cocaine, the jury was permitted to interpret the term in light of Walton's testimony that Tinch explicitly stated that he wanted a supply of cocaine.

Similarly, Tinch asks the Court to consider in isolation his text asking an undercover officer to "[s]top trying to get me to say I want to buy some cocaine for you," claiming that it is exculpatory. According to Tinch, this is a clear statement that he does ***not*** want to buy cocaine. But the jury saw other texts in the relevant chain of messages indicating that this statement was in

9

response to Tinch's suspicions that his contact was actually a federal officer trying to catch him making a drug deal. Looking at the entirety of the texts, a reasonable jury could easily conclude that Tinch, aware that his contact knew he wanted to purchase cocaine, was warning the suspected officer that he would not be caught saying so in writing. Indeed, the statement itself is not as exculpatory as Tinch suggests—far from stating that Tinch does not want to buy cocaine, the text indicates only that he will not confirm, in writing, that he wants to do so.

Tinch's remaining arguments concerning the sufficiency of the evidence against him raise questions of fact that are exclusively reserved for the jury. *See United States v. Warren*, 593 F.3d 540, 547 (7th Cir. 2010) (recognizing that "[s]orting the facts and inferences is a task for the jury"). For instance, Tinch claims that his inspection of the sham kilogram of cocaine shortly before he his arrest was too cursory for him to have confirmed the quantity and type of drug. Relatedly, Tinch contends that the jury could not assume that his statement indicating that the sham kilogram was "good" meant that he was fully satisfied because he was arrested before he had a chance to make a potentially exonerating statement. But whether his inspection was sufficient or his statement was inculpating are questions of fact for the jury. And a rational trier of fact, when shown Tinch inspecting the sham cocaine and indicating that yes, it was good, could reasonably infer that Tinch did in fact believe that he was receiving a kilogram of cocaine.

Simply put, there was ample evidence to support the jury's finding that Tinch attempted to possess 500 grams or more of cocaine. *See United States v. Presbitero*, 569 F.3d 691, 704 (7th Cir. 2009) (noting that a court may "set aside a jury's guilty verdict only if the record contains no evidence, regardless of how it is weighed, from which a jury could have returned a conviction" (internal quotation marks omitted)). Accordingly, Tinch's motion for a partial judgment of acquittal is denied.

## II. Request for New Trial

### A. Evidence of "Job" for the Cartel

In the alternative to his request for partial judgment of acquittal, Tinch seeks a new trial pursuant to Rule 33. In support of this request, Tinch first argues that the Court erred in allowing Walton to testify about the "job" Tinch was to perform for a Mexican cartel. According to Tinch, there was no permissible purpose for the introduction of that evidence, which he believes to have been unfairly prejudicial.

The Government initially sought, in its motions *in limine,* to admit "other acts" evidence pursuant to Federal Rule of Evidence 404(b)(2) to show that Tinch had agreed to carry out a kidnapping plot as part of his negotiations for a supply of reasonably priced cocaine. Recognizing that kidnapping is arguably more sensational crime than those with which Tinch had been charged, the Court found that references to the plot could potentially inflame the jury. Accordingly, the Court denied the motion *in limine* and instead barred the Government from playing any recordings related to kidnapping or having its witnesses testify to any plans to carry out the kidnapping. However, the Court also acknowledged the Government's legitimate need to provide context to the charged crime and elicit testimony concerning Tinch's negotiations to obtain a supply of well-priced cocaine from the cartel. So the Court allowed the Government to elicit, as long as the testimony was sanitized to work around the exclusion of evidence of the alleged kidnapping plot.

At the final pretrial conference, the Government proposed referring to the kidnapping plot as a "job." Tinch did not object to use of this term at that time, and the Court found that to be a reasonable manner in which to sanitize the anticipated testimony. Tinch now argues that the use of the term "job" to describe the kidnapping plot actually exacerbated the prejudice against him

11

by implying he was involved in an even worse offense than kidnapping. But, as the Court noted in its ruling on the motions *in limine*, the uncharged kidnapping offense was a more sensational crime than the charged firearms and narcotics offenses. Including details of the plot could have risked jurors drawing "the forbidden propensity inference" and convicting Tinch not because they thought him guilty of the charged offense, but because they believed he was violent and prone to crime. *United States v. Pulliam*, 973 F.3d 775, 785 (7th Cir. 2020) (internal quotation marks omitted). The use of a neutral term like "job," however, properly balanced the need to provide some explanation for the low price Tinch would get for the cocaine with the need to limit any unfair prejudice against Tinch. *See Gomez*, 763 F.3d at 857 (noting that determining whether the risk of unfair prejudice substantially outweighs probative value is a "highly context-specific inquiry"). Moreover, although Tinch contends that the term "job" suggests an even more nefarious offense than kidnapping (essentially, murder) a jury could also assume that the job was something **less** sensational, like acting as a drug courier or obtaining firearms for the cartel.

The admission of the sanitized evidence about a "job" also fairly addressed the issue of why Tinch's negotiations with cartel members resulted in a relatively low price for a kilogram of cocaine. At trial, Tinch's counsel elicited testimony from Walton that a price of $2,000 for a kilogram of cocaine would be significantly below market value; the purpose of this line of questioning being to suggest to the jury that Tinch could not have thought that he was receiving either the quantity or type of drug alleged by the Government at such a low price. The Government thus was entitled to provide an explanation for the low price to address the issue raised by Tinch. *See United States v. Gomez*, 763 F.3d 845, 857 (7th Cir. 2014) (describing how an "important issue in Rule 403 balancing . . . is the extent to which the non-propensity factual proposition actually is contested in the case"). While Tinch suggested that the low price for the

drugs necessarily meant that he could not have desired cocaine, the low price is explained when placed in the context that Tinch had negotiated a substantial discount on the cocaine as part of his payment for performing another job for the cartel. The reference to Tinch's job for the cartel, therefore, had significant probative value as to the nature and quantity of the drugs involved in the offense. *See United States v. Gorman*, 613 F.3d 711, 720 (7th Cir. 2010) (noting that courts are "more prone to tolerate some risk of prejudice when the evidence at stake is significantly probative" (internal quotation marks omitted)).

      Relatedly, Tinch asserts that the Court erred in allowing the Government to introduce evidence that Tinch was a member of a "group" that "specializes" in jobs like the one he had agreed to perform for the cartel. Initially, the Government did not seek to introduce evidence that Tinch told Walton that he was a member of the Hobos, a street gang that specialized in home invasions and robberies. During Walton's cross-examination, however, Tinch's counsel asked questions suggesting that Walton had no reason to seek out Tinch to help with the job opportunity. In response, the Government sought to elicit testimony from Walton that he approached Tinch in part because of Tinch's association with a group that specialized in those types of jobs. Tinch's counsel objected, arguing that Walton had already testified that he had approached Tinch because Tinch had indicated that he wanted a source for cocaine. Finding that defense counsel had opened the door to evidence about whether Walton had other reasons to believe Tinch might be interested in the job, and also noting that Walton clearly had been prepared to testify with the limitations of the Court's motion *in limine* ruling in mind and had carefully avoided any references to the kidnapping plot or Tinch's other associations as a result, the Court allowed a sanitized version of the evidence to be introduced. *See United States v. Anifowoshe*, 307 F.3d 643, 649 (7th Cir. 2002). Given the increased probative value of Tinch's

gang associations following Walton's cross-examination and the possibility that the jury would be left with a misleading version of events as a result of the cross-examination, the Court appropriately allowed a limited inquiry into Walton's reasons for thinking Tinch might be interested in the job for the cartel. Furthermore, the Court properly addressed the potential that this testimony inflame the jury by sanitizing the most inflammatory part.

As a final note, although Tinch relies heavily on his claim that the inclusion of the sanitized evidence necessarily prejudiced the jury against him, that same jury acquitted Tinch of the two charged firearm offenses. To the extent Tinch claims that references to a "job" or his relationship with a "group" that "specializes" in jobs unfairly associated him with violent acts, his acquittal on the weapons charges suggests that he was not prejudiced in that manner. To the contrary, although not dispositive, the acquittals indicate that the jury separately considered the evidence as to the elements of each offense in reaching its conclusions. *See, e.g.*, *United States v. Delatorre*, 581 F. Supp. 2d 968, 989 (N.D. Ill. 2008) (describing how a jury's "somewhat split verdicts are a strong indication that the jurors followed [the court's] instructions"). Tinch's motion for a new trial is therefore denied.

### B. Jury Instructions

Next, Tinch contends that an error in the jury instructions necessitates a new trial pursuant to Rule 33.[4] As a preliminary note, Tinch's briefing suggests that he might also be arguing that the

---

[4] Following defense counsel's filing of initial post-trial motion briefs, Tinch himself made a handful of *pro se* filings in connection with the pending motions. On January 31, 2022, after confirming that Tinch wished to continue being represented by counsel and did not seek to proceed *pro se*, the Court addressed these filings. Specifically, the Court denied the *pro se* motions filed by Tinch (Dkt. Nos. 222, 236) as improper given that Tinch is represented by counsel and explained that any future filings must be made by counsel. (Dkt. No. 253.) Consistent with that discussion, the Court has not considered any of Tinch's *pro se* filings in connection with these motions. However, the Court also instructed defense counsel to meet and confer with Tinch to make certain that all issues Tinch desired to be raised had been addressed by counsel. After consulting with Tinch, defense counsel requested leave to file a supplemental motion

purported error in the jury instructions provides grounds for a judgment of acquittal pursuant to Rule 29. This appears to be another route to argue that there was not enough evidence for the jury to find Tinch guilty beyond a reasonable doubt of attempting to possess 500 grams or more of cocaine, in particular. Accordingly, it fails for the reasons discussed above. Here, the Court considers whether any improper instruction necessitates a new trial under Rule 33.

Tinch claims that the jury instructions were deficient because the jury was never instructed that the Government needed to prove beyond a reasonable doubt that Tinch intended to possess *cocaine* rather than just any controlled substance.[5] In particular, Tinch asserts that the combination of the jury instruction listing the elements for attempted possession with intent to distribute, the special instruction for drug quantity, and the Special Verdict Form misinformed the jury that the Government only had the burden of proving beyond a reasonable doubt that Tinch intended to possess *any* controlled substance, not cocaine specifically.

Tinch did not raise any such concern about the jury instructions when the Government first submitted its proposed instructions before trial or at the final charge conference during trial. Accordingly, the Government contends that Tinch has waived any challenge to the Court's jury instructions by failing to object. *United States v. Pree*, 408 F.3d 855, 873 (7th Cir. 2005). Waiver totally extinguishes a defendant's ability to later challenge jury instructions. *Id.* (explaining how a defendant who has waived an objection "has no recourse and generally must live with his earlier decision not to press the error"). Historically, this "rule is strictly applied to affirmative expressions of approval, including affirmative statements as simple as 'no objection' or 'no

---

for post-trial relief concerning the jury instructions. The Court granted this oral motion and set a briefing schedule for the Government's response and Tinch's reply. (Dkt. No. 253.)

[5] Pursuant to the Supreme Court's decision in *Apprendi v. New Jersey*, "other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. 466, 490 (2000).

problem' when asked about the acceptability of a proposed instruction." *United States v. Friedman*, 971 F.3d 700, 712 (7th Cir. 2020) (internal quotation marks omitted). Recently, however, the Seventh Circuit has "acknowledged the harshness of this rule may be inappropriate if it appears counsel merely negligently bypassed a valid argument rather than making a knowing intentional decision." *United States v. Freed*, 921 F.3d 716, 720 (7th Cir. 2019). Thus, "[w]hen it appears a reflexive 'no objection' response was given during a rote colloquy," courts may look to the record to determine whether the objection was truly waived or merely forfeited, in which case plain error review of the allegedly deficient instructions would apply *Id.*

Here, Tinch clearly waived any objection to the jury instructions. Although Tinch argues that he acceded to the jury instructions as part of a rote call-and-response, this is simply not so. Tinch was given multiple opportunities to discuss and object to the instructions, including when the Government initially submitted proposed jury instructions before trial and later at the final jury instruction conference. At no point did Tinch object or submit his own instructions. Most significantly, the instructions with which Tinch takes issue were the subject of an extensive discussion during the final charge conference. In fact, the Court changed the wording of the jury instructions following this conference to omit much of the language Tinch now asserts misled the jury.

Specifically, Tinch contends that the jury instructions contained language stating that the Government did not have to prove that Tinch intended to possess cocaine as opposed to another controlled substance. According to Tinch, the instruction for the elements of the offense of attempted possession with intent to distribute included:

> The defendant believed that the substance was some kind of a controlled substance. ***The government is not required to prove that the defendant believed the substance was cocaine; . . .***

(Gov's Resp. to Def.'s Supp. Post-Trial Mots., Ex. 1, Final Jury Instructions at 33, Dkt. No. 260-1.) (emphasis added). This, however, is not the wording used for the final instructions actually provided to the jury. The Government initially proposed including the second sentence in the jury instructions— at the final charge conference, however, the Court *sua sponte* raised the issue of whether this language might be confusing. Although the second sentence is included as a bracketed option in the Seventh Circuit's pattern instructions, the Government agreed that the second sentence was unnecessary and potentially confusing given that this case involved a sham substance and thus suggested dropping the language. Tinch agreed with that change. Consequently, the instructions given to the jury did not include the language to which Tinch now objects—a review of both the final written instructions and the transcript of the Court's oral instructions to the jury confirm this to be true. In short, Tinch participated in a meaningful discussion about the jury instructions to which he now objects, a discussion that in fact addressed the very issue Tinch raises (juror confusion about the burden of proof as to the type and quantity of drugs involved) and indicated that he approved of the resolution of that issue. As a result, Tinch has waived any further objections to these instructions.

Even if Tinch had not waived his objection to the jury instruction, his argument fails on the merits. The Court used the applicable pattern instruction for the offense of attempt to possess with intent to distribute a controlled substance, and use of the pattern instructions is presumptively correct. *United States v. Marr*, 760 F.3d 733, 744 (7th Cir. 2014) ("We presume that the Pattern Criminal Jury Instructions for the Seventh Circuit correctly state the law" (internal quotation marks omitted)). The pattern instructions include the special instruction for drug type and quantity—an instruction that explicitly states that "[i]n making this determination, [the jury was] to consider any type and amount of cocaine for which the government has proven **beyond a**

*reasonable doubt* that the defendant attempted to possess with intent to distribute." (Final Jury Instructions at 38.) (emphasis added). Indeed, the special instruction expressly directed jurors that if they found that the Government had *not* proven beyond a reasonable doubt that the offense involved a quantity of cocaine, the jury should answer respond "no" to both options on the accompanying Special Verdict Form.[6] (*Id.*) And has already been discussed, despite Tinch's assertion to the contrary, the jury was *not* instructed that the Government did not have to prove that Tinch believed the substance was cocaine. In other words, the jury instructions clearly and correctly communicated to the jury that any determination as to drug type and quantity had to be beyond a reasonable doubt.

So even if Tinch had not waived his argument concerning the jury instructions, the jury was properly informed as to the Government's burden of proof. Consequently, there is no error justifying a new trial under Rule 33.

---

[6] If the jury found Tinch guilty of the attempted possess count, they were instructed to fill out a Special Verdict Form regarding the drug type and quantity involved in the offense. Specifically, jurors were told to complete the following:

> We, the jury, find that the amount of controlled substances involved in Count 2 that the government has proven beyond a reasonable doubt the defendant attempted to possess with intent to distribute is [write] "Yes" or "No" in the applicable line below.
>
> - 500 grams or more of cocaine     _____
> - A quantity of cocaine     _____

(Gov's Resp. to Def.'s Supp. Post-Trial Mots., Ex. 2, Verdict Form at 3, Dkt. No. 260-2.)

18

## CONCLUSION

For the reasons discussed above, Tinch's consolidated post-trial motions (Dkt. No. 203) are denied both as to his request for partial judgment of acquittal and his request for a new trial.

Dated: April 10, 2022

Andrea R. Wood
United States District Judge